**PARK EAST CORPORATION d/b/a Park East Hospital, Plaintiff,**

v.

**Joseph CALIFANO, Secretary of United States Department of Health, Education and Welfare, et al., Defendants.**

No. 77 Civ. 1241.

United States District Court, S. D. New York.

April 28, 1977.

As Amended June 9, 1977.

Schekter, Aber & Hecht, P. C., by Marvin L. Tenzer, Zane & Zane by James B. Zane, New York City, for plaintiff.

Robert B. Fiske, Jr., U. S. Atty. S. D. N. Y., New York City by William J. Hibsher, Asst. U. S. Atty., for Federal defendants (Califano and Wilson).

Louis J. Lefkowitz, Atty. Gen., by A. Seth Greenwald, Asst. Atty. Gen., New York City, for New York State defendants (Toia and Whalen).

OWEN, District Judge.

This is a motion for a preliminary injunction by Park East Hospital to restrain certain New York State officials from in effect ending its existence by acts alleged to be malicious, discriminatory and unlawful.

Park East Hospital, at 112 East 83rd Street, New York, New York, is a small proprietary hospital of 106 beds built in the 1930's. In 1973 there was a transfer of ownership to seven physicians connected with the hospital. Subsequently, four of the doctors dropped out of the partnership, leaving as the present owners Doctors

Shaw, Diamond and Thomas.[1] The hospital has also been the subject of ongoing hearings before a State Hearing Officer, Earle Zaidens, regarding alleged violations of the State Hospital Code and Life Safety Code.

In October 1976, the hospital was informed that it was being considered for termination of its participation in the Department of Health, Education and Welfare (HEW) Medicare/Medicaid program. A meeting was held between the hospital and HEW on October 28, 1976, a plan of correction was later submitted and inspection visits to the hospital were made.[2] Finally, on March 2, 1977, the hospital was informed that its participation as a provider of services was to be terminated as of April 1, 1977 and that notice of that termination would be published on March 17 in the New York Times. Because the alleged deficiencies, relating to the Life Safety Code and to the Pharmacy Conditions of Participation, were

considered by HEW to create "a serious life threatening situation,"[3] it was asserted that any hearing protesting HEW's decision would have to be conducted after the termination of the hospital.

On March 15, 1977, Park East filed its original complaint herein together with an order to show cause seeking to enjoin HEW, as well as various state officials who administer Medicare/Medicaid money, from terminating the hospital participation in the Medicare and Medicaid programs prior to a hearing. On that date, I signed a temporary restraining order[4] with attorneys for all parties present, and set a hearing for March 17 on whether the hearing should be pre or post-termination.

On the morning of March 17, I personally toured the Park East Hospital with attorneys for all parties as well as various experts,[5] who pointed out or disputed certain

1. The Park East Corporation is the actual owner of the hospital, and is presently the debtor-in-possession under Chapter XI of the Bankruptcy Act. Doctors Shaw, Diamond and Thomas are the sole stockholders of the Park East Corporation. The hospital ran into difficulties with the State Public Health Council and the Commissioner of Health regarding approval of the transfer of ownership, and in 1975 the hospital's operating certificate was revoked on this ground. In an Article 78 proceeding, the operating certificate was restored by the court. For a history of these events, see *Park East Corp. v. Whelan*, 47 A.D.2d 296, 366 N.Y. S.2d 432 (1st Dept. 1975).

2. The State's subsequent refusal to approve allegedly-needed corrective plans is dealt with hereafter, as is a curious juxtaposition of a highly negative pharmacy inspection by an HEW employee followed shortly by a routine State inspection showing the pharmacy to be in compliance.

3. The letter stated:
"We are aware that your facility requires the permission of the New York State Department of Health before the significant physical plant corrections can be made. This office recently contacted the Department of Health and we were informed that your facility had not yet submitted *an acceptable request* for permission to correct the significant physical plant deficiencies. If an application is finally submitted, undoubtedly a considerable amount of time will elapse before a final decision is reached. In the interim, a serious life threatening situation continues to be in

existence which can no longer be tolerated for an indefinite length of time." (Emphasis supplied.)

4. The order reads as follows:
"ORDERED, that pending the hearing and determination of this application, the defendants, their attorneys, officers, agents, servants, employees and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, be restrained and otherwise enjoined from (a) terminating the participation of PARK EAST HOSPITAL in the Medicaid and Medicare Programs; (b) removing Medicaid and/or Medicare patients from the PARK EAST HOSPITAL; (c) discontinuing reimbursement to the said facility for care rendered to Medicare and Medicaid patients, and (d) taking any and all further steps or actions relating to the termination or participation of PARK EAST HOSPITAL in connection with the said Medicare and Medicaid programs, including but not limited to, serving notice by publication in the New York Times in connection with said termination of PARK EAST HOSPITAL in said programs . . . ."

5. Present for Park East were: J. Russell Clark, the hospital's administrator; Allan A. Sylvane, a licensed professional engineer; Irving P. Marks, the hospital's consulting architect; Charles F. Boswick, the hospital's consultant in fire safety and disaster planning; and Dr. James Thomas, one of the hospital's operators.

Present for HEW were: Milton Webber, Program Officer for HEW; Richard Pike, an architect who inspected Park East; Emilio Pucillo,

alleged violations. The hearings were continued in the courtroom that afternoon, as well as on March 18, 21 and 24, with considerable testimony being taken.

On April 4, 1977, Park East served an amended verified complaint adding Blue Cross/Blue Shield as a party [6] and a fourth cause of action.[7]

During the pendency of the case before me, Park East and HEW entered into settlement negotiations and a stipulation of settlement was signed on April 4, 1977, giving Park East 60 days in which to make

an architect and Mr. Pike's supervisor at HEW; and Louis Beshara, a pharmacist who inspected Park East.

Present for New York State were: Joseph Marino, an architect for the New York State Department of Health for the City of New York, and Albert Lyons, an engineer for the Department of Health.

6. Since Blue Cross/Blue Shield was not a party to the hearing, they are not affected by the determination of this motion.

7. A further order issued against the State after oral argument, based on this fourth cause of action, staying all proceedings by the State against the hospital, which had sought to enforce an order by Commissioner of Health Whelan closing the hospital, and was signed the day *after* I signed the original TRO.

8.            AS AND FOR A FOURTH
                  CAUSE OF ACTION
   "27. The jurisdiction of this Court as to this Cause of Action arises under Title 42, United States Code, Sub-chapter XIII, § 300k et seq. (National Health Planning and Resources Development Act of 1974, hereafter the "National Health Planning Act"), and under 28 U.S.C. § 1331(a) in that the matter in controversy exceeds the sum of $10,000.00, exclusive of interest and costs, and arises under the Constitution and laws of the United States.
   "28. The National Health Planning and Development Act preempts the jurisdiction of the State of New York in areas covered by said legislation by virtue of the Supremacy Clause of the Constitution of the United States by reason of Congressional findings set forth in 42 U.S.C. § 300k, and the establishment of National Guidelines for Health Planning pursuant to 42 U.S.C. § 300k–1.
   "29. Pursuant to the said National Health Planning Act, the State of New York was required to establish a "State Health Systems Agency" pursuant to 42 U.S.C. § 300*l*–2, for the purposes therein set forth.

certain corrections. Therefore, the only controversy remaining before me is between Park East and the various State defendants.

In the original complaint, jurisdiction over the State defendants was based on a claim of pendent jurisdiction. The State has moved to dismiss this complaint for lack of subject matter jurisdiction. However, I need not reach that question, for the fourth cause of action in the amended complaint [8] alleges facts which clearly give this court "federal question" jurisdiction over the State defendants.[9]

   "30. That pursuant to 42 U.S.C. § 300m–2 the State Health Systems Agency was responsible in New York to conduct the health planning activities.
   "31. That in violation of the aforementioned provisions of Title 42, U.S.C., the State defendants knowingly and wilfully violated same by establishing a "strategy", which did not meet the legal requirements of a State Plan providing for the elimination of plaintiff's hospital within New York, without said "strategy" being initiated, conducted or approved by the State Health Systems Agency.
   "32. The actions of the State defendants in attempting to close plaintiff's hospital is motivated by actual malice, prejudice and bias.
   "33. The actions of the State defendants in attempting to close plaintiff's hospital is discriminatory, without lawful justification.
   "34. The State defendants, in furtherance of their illegal actions aforesaid, have pre-determined to effectuate the closing of plaintiff's hospital, and as a means to implement same have denied, and continue to deny plaintiff's procedural and substantive due process, both as to federal law and New York law, in denying plaintiff permission to make repairs and alterations to the hospital and have conspired with the defendant Blue Cross and Blue Shield of Greater New York, to the end that plaintiff's hospital will be closed, and in furtherance thereof, said Blue Cross has illegally terminated plaintiff's participation in the Blue Cross/Blue Shield Program.
   "35. The State defendants have conspired together and with the defendant Blue Cross and Blue Shield of Greater New York to violate the foregoing provisions of Title 42 of the United States Code in order to deny plaintiff of its assets, property, rights, privileges and immunities, as same are secured to plaintiff under the Constitution of the United States and the Amendments thereto."

9. By motion dated April 15, 1977, the State seeks to dismiss this fourth cause of action as well. For the reasons set forth in this opinion, that motion is denied.

The fourth cause of action is based on the National Health Planning and Development Act, 42 U.S.C. §§ 300k *et seq.* (the Act) which was enacted to provide for comprehensive health planning.[10]

The Act calls for the setting up of local Health System Agencies (HSAs),[11] with mandated requirements for their legal structure, staff size, composition and the public nature of their meetings, § 300*l*–1(b). The primary function of an HSA is health planning, including "preventing unnecessary duplication of Health resources . . . ." § 300*l*–2(a)(4). The HSA is to develop a Health Systems Plan (HSP) including an Annual Implementation Plan (AIP), § 300*l*–2(b). The HSA is also to review at least every five years "all institutional health services offered in the health service area of the agency and . . . make recommendations to the State health planning and development agency designated under section 300m . . . respecting the appropriateness in the area of such services." § 300*l*–2(g)(1).

The Act also calls for creation of State Health Planning and Development Agencies and Statewide Health Coordinating Councils, § 300m, which, *inter alia,* coordinate the HSPs and AIPs submitted by the various HSAs, and form State Health Plans. The Act finally calls for the promulgation of guidelines for and the general supervision of the entire system by the Secretary of HEW. *See, e.g.,* §§ 300k–1, 300k–2, 300n–1(a).

■ In order for the State to close Park East as an excess facility in accordance with the Act, the HSA, after written notification to Park East, § 300n–1(b)(1), study and public hearings, would have to make its recommendations to the State Health Planning and Development Agency. Park East could again demand public hearings before the State agency. § 300n–1(b)(8).

While "the purpose of findings by the State Agency is to inform the public and providers of health services as to the appropriateness of particular services and what, if any, voluntary remedial actions are advisable" Conf. Rep. No. 93–1640 (93d Cong., 2d Sess. 1974) 77, and therefore New York State would not be bound by a recommendation to keep Park East open as not excess, the State could not make its determination until *after* the mandated review under the Act, and presumably after consideration of such facts as that review revealed. To hold otherwise would be to make the Act meaningless.

■ Even this brief summary of the National Health Planning and Development Act makes it clear that Congress intended federal preemption in the field of health planning. There is no claim that this Act in any way affects a state's inherent police power to regulate hospitals and insure their compliance with various state health and hospital codes. However, the complaint alleges that the State defendants' acts in attempting to close Park East are motivated by a desire to eliminate excess hospital beds in New York State in contravention of the Act. This states a cause of action cognizable in a federal district court. While the Act does not expressly provide a remedy to a party aggrieved by reason of noncompliance, a federal remedy must be implied, given Congress' clear intent to have all health planning realized pursuant to the Act. "We, therefore, believe that under the circumstances here it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." *J. I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964).

■ Having determined that there is jurisdiction here, the next question is whether a preliminary injunction is appropriate.

10. "[I]t is the purpose of this Act to facilitate the development of recommendations for a national health planning policy, to augment areawide and State planning for health services, manpower, and facilities, and to authorize financial assistance for the development of re- sources to further that policy." 42 U.S.C. § 300k(b).

11. New York City has such an HSA, which is funded by a $1.15 million grant from HEW.

The well-established standard for the issuance of a preliminary injunction is whether there has been "a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Sonesta Int'l Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973) (emphasis in original).

■ A showing of irreparable injury is clearly made, for it is obvious that Park East would cease to function following State enforcement of Commissioner Whelan's order of March 16, 1977. The State claims, however, that there is immediate danger to the life, health and safety of patients at the hospital if it is allowed to remain open. If such were shown, I would not consider an injunction. However, given the entire record, including my personal, guided inspection, the testimony of the State's own witness, George Early, and the State's routine pharmacy report of January 14, 1977, I do not find such an immediate danger exists.[12] Therefore, the "balance of hardships [tips] decidedly toward" Park East.

As to the hospital's likelihood of success on the merits, I find the following facts after four days of hearings and the receipt of much documentary evidence.

The hospital's claim, in essence, is that the State, having determined to reduce hospital beds in New York City, rather than proceeding under the Act, has resorted to the assertion of claims of various violations in the structure of the building and the operation of the hospital to force its closure.

Park East contends that the alleged violations are either without sufficient merit to warrant closure of the hospital, and/or that the hospital has been deliberately prevented from remedying these violations by the State's refusal for one reason or another to act on the applications for permission to remedy. Park East, having been turned down by the State in its efforts to comply, charges that the State is now using the failure of compliance as a basis for closure.

It appears without question that there have been and are an excess of general care hospital beds in New York City, and that the reduction of this excess has for some time been a matter of official concern. The report of the Health and Hospital Planning Council of Southern New York, Inc., of February 4, 1976, specifically lists Park East as a hospital not needed and significantly comments that it had been "previously recommended for closure . . . ." Governor Hugh L. Carey, in his "State of the Health" message to the Legislature of February 17, 1977, further enunciated this concern, stating, "A strategy to effect the orderly closure of excess bed capacity in our general hospitals is to be developed within the next few months." [13]

---

12. I note particularly that the Commissioner's order is premised upon "structural deficiencies," which was completely undercut by Mr. Early's testimony that the violations could be corrected and that waivers were appropriate as to certain of them (see n.15 *infra*). HEW is implicitly in accord with this view, having stipulated to a sixty day period for corrective action. On this very subject, Mr. Milton Webber, Program Officer of the Bureau of Health Insurance of HEW for Region II, testified that "If we thought we could have gotten a reasonable resolution in a reasonable amount of time we would not have terminated. . . . But if I can't see the end of the road . . . I have to worry about that . . . ." Under the hospital's stipulation with HEW, the hospital is presently proceeding with construction to remedy the Life Safety Code violations cited by

HEW in its termination letter. This construction is to be completed by May 20, 1977.

13. Of significance is the following exchange between the Court and Mr. Early reflected in the record on the last day of the hearings:

[The Court]: . . . Mr. Early, the other night in the robing room, said at one point, when I was trying to see if we couldn't work this thing out, he said to me, "What does this do to Governor Carey's effort to reduce the number of beds?" I am troubled by that.
[The Witness]: I didn't say those words.
[The Court]: Well, in substance you said that to me . . . .

I note, however, that unlike the showing Park East has made as to the acts of other State officials, Gov. Carey proposed that the State act "consistent with the requirements of the

It would appear that this "strategy" was already being applied to Park East in 1974, for its operating certificate was revoked by the State Commissioner of Health, Robert P. Whelan, on the ground that the Public Health Council had not approved the transfer of ownership. From the opinion of the Appellate Division, 366 N.Y.S.2d at 433, it appears that the failure to "approve" the application was rather a failure *to act upon it,* for at the time of the proposed revocation of the Operating Certificate, the Council had the application for a transfer pending before it but had not acted. The foregoing caused the Appellate Division to unanimously observe as follows:

> The punishment of revocation, however, which has been imposed is clearly unreal and harsh. The hospitals seem to be operating in exemplary fashion, the proposed transferees, who are in effective control, are physicians from the community, and the area served is benefitted by the continued operation of the hospitals. No suspension or other interruption of services seems warranted, and any disruption can only be harmful to the ongoing services of the hospitals, their employees and patients, and those associated with them.
>
> While the record is not clear as to why an application for transfer of ownership has not been ruled upon by this time, it would seem that in this matter a definitive determination by the Public Health Council should come prior to any sanction being imposed. The intervening petitioners have not operated by stealth. The documents and the related agreements and papers for the sale of the stock were filed with the Public Health Council, and there is no indicia of any untoward aspect. 366 N.Y.S.2d at 434.

National Health Planning and Resources Development Act . . . ."

14. I note that Sydenham, a Manhattan municipal hospital, was one of those listed as excess. I include it in the total of those Mr. Early inspected because although he did not inspect Sydenham, he did inspect its competitor that

Appropriate to consider at this point is the fact that of the 28 "unneeded facilities" to be closed listed in the February 4, 1976 report of the Health and Hospital Planning Council of Southern New York, Inc., Mr. Early inspected 19 of those,[14] including Park East, because they were on a "priority list." Conversely, and of statistical significance, is the fact that in over two years Mr. Early only inspected 29 hospitals (including the 19 on the "priority list"). He stated as to this in hearings before State Hearing Officer Zaidins:

> "A. I might add the list I believe was probably determined by those hospitals where beds were deemed to be not needed purely on the basis of bed needs throughout the city.
>
> "Q. That was the basis of your inspection?
>
> "A. Yes."

Events appear to have moved with considerable speed in early 1976 and, in an apparent effort to cause the federal government to be the agency forcing Park East's closure, Dr. Frank T. Cicero, Second Deputy Commissioner of the New York State Department of Health, on May 14, 1976, sent by hand materials to the Social Security Administration, urging that the said materials were an appropriate basis for federal decertification, and stated, "I would like to impress upon you the urgency of taking effective and immediate action to prevent [Park East] from collecting further Federal/State monies."

In the course of the summer, hearings before the State hearing officer were begun on Park East, and continued in a desultory fashion over several months, there being statements made by State officials to Park East indicating that some of the structural

was not listed, Arthur C. Logan Memorial Hospital, a voluntary hospital which is also now before me in 77 Civ. 1216, alleging that it is the target of discriminatory closure efforts by the New York City Health and Hospitals Corporation, the purpose of which are to save Sydenham. I have granted a preliminary injunction in that case.

deficiencies [15] of Park East might well be waived.

When it became apparent in the fall of 1976 that waivers were *not* to be forthcoming, Park East, after having reasonably waited, prepared rough architects' plans to comply with the State's demands and the proposals for alterations were submitted to the State on November 18 and 19, 1976. These proposals were rejected by the State in a letter dated December 2, 1976, in which the basic explanation was that "we cannot accept corrections piecemeal . . . ." [16]

On December 20, 1976, Park East received a letter from Deputy Commissioner Glenn Haughie stating that an application for a sidewalk lift from the basement, which had been made two years earlier, was disapproved "on the basis of need." However, given the State's attitude toward Park East expressed in the Cicero letter of May 4, 1976, this revealing, too-flat rejection on March 4, 1977, was quickly replaced by a less flat rejection, in which Deputy Commissioner Haughie wrote to Park East and explained that this disapproval was in error since hearings were in progress, and the application would be carried as a pending application to be ruled on at the close of the hearings. [17]

There are other deficiencies alleged by the State. [18] Turning to the pharmacy department, during the fall of 1976, a federal investigator found non-compliance. Park East complained that the investigator who came was biased, and a reinvestigation was made by one Louis Beshara. Beshara'

---

15. The nature of these deficiencies has been subject to unexpected change. The hearings before me were commenced on the premise that the federal government, based on both a state and federal inspection, charged, among other things, (1) non-complying fire doors in the two stairwells, and (2) an inadequate second fire egress which dipped part-way into the basement before rising to the street level exit door. The doors, it was claimed, required total replacement and the second egress required complete rerouting and rebuilding. However, on the *last day* of the hearing before me, Mr. Early, the State inspector, testified for the first time that a waiver might have been granted as to the non-complying doors since they were—in fact are now—fire resistant,

> [Mr. Early]: . . . I was willing to accept that the department would review a request for waiver on the stair doors upstairs through the building . . .

and that the front stairway, rather than needing rerouting, was and is in fact remediable with the mere addition of a separation at the landing half-way between the first floor and the basement:

> [The Court]: You already say you are prepared to accept the front stair that goes down and makes a dip into the basement and comes up.
> [Mr. Early]: There would have to be created a separation between the portion that continues down from the intermediate landing and the portion that then goes out to the front.
> [The Court]: I see. All right.

16. Given Deputy Commissioner Cicero's peremptory letter to federal authorities the prior May (see p. 52 *supra*), this is arguably a spurious subterfuge. On the hearing before me, the State shifted its emphasis for rejection to the fact that the ownership of the hospital was not spelled out in the papers. I reject this explanation based on an assessment of the entire record, the opinion of the Appellate Division and an awareness that the cost of the alterations was relatively small.

17. Why should the State, one queries, feel it has the power to decline to act on ordinary requests in the normal course merely because hearings are going on? This obviously gives it the power to frustrate compliance efforts by this simplest of expedients.

18. Somewhat troublesome is some evidence introduced by the State that the operating room is not all that it should be. The State hearing officer, Professor Zaidins, based upon testimony furnished to him, came to a conclusion that the radiators in the operating and recovery rooms presented a health hazard. Testimony was also presented before me with regard to the window air conditioning not adequately filtering dust. It would appear that these conditions, acceptable in a hospital's operating room when this building was constructed 40 years ago, may no longer be acceptable. This is, however, certainly by itself, not a basis for closure of an institution, particularly given the willingness of the owners to invest capital and make other structural changes, such as those being made at this very moment. I assume appropriate and expeditious State approval for any necessary changes will be forthcoming.

wrote a report devastatingly critical [19] of the hospital's pharmacy department as well as other aspects of the hospital, as to which Mr. Beshara appears to have little competence to judge. The weight and credence to be given Mr. Beshara's report is further a troublesome question for the Court, since it is the fact that within a number of weeks, *in the regular course* of routine inspections by the New York State Education Department Board of Pharmacy, an inspector went through the pharmacy and found it in compliance with State standards. It is of further significance to note that after the hospital put into evidence the subsequent routine examination of the pharmacy finding it to be in "compliance," the State made no effort whatsoever to call the inspector to "comment" upon or alter his findings.

Finally, I note that during the course of the hearings, on the evening of March 21st, during the third session of the hearings, Mr. Early answered the Court as follows:

Q. Reasonable comprehensive plans were in your hand. Is there any reason that could not receive appropriate consideration?

A. Yes.

Now there is since, the Commissioner's letter to close the facility.

Q. Well, I know, but the Commissioner's letter to close the facility is another matter and we can give that the appropriate consideration in the context, but assuming that—

A. I had previously testified in the hearing that the building was correctable.

At that point, I brought the parties into the robing room to see if there was a possibility of resolving the issues, having throughout this hearing expressed my view that I would regret the demise of an operating facility that was serving the community unless there were compelling reasons for it. I urged all parties to explore this.

When we resumed the hearing three days later, I was presented with a letter from Assistant Commissioner Warren Toff, in which the efforts to resolve the issues were rejected on the basic theory that the structural deficiencies had not been corrected and the operational deficiencies had not been *timely* corrected. I must view this final rejection, indeed the entire attitude of the Department of Health, in the light of the contents of a memorandum of January 26, 1977 to Milton Webber from Morris London, Director of Division of Quality and Standards of HEW, in which he writes:

> Attached is the report of a follow-up on the Plan of Correction and surveys conducted by Ms. Whitney, Mr. Beshara and Mr. Straub.
>
> You will note that although considerable improvement has been shown by [Park East] in correcting deficiencies in the operational aspects, several key areas continue to remain out of compliance with the Medicare Conditions of Participation. *Furthermore, these Conditions, Compliance with State and Local Laws and Life Safety Code deficiencies, will continue not met, unless the New York State Department of Health permits the facility to institute corrective action.* (Emphasis added.)

Given all the foregoing, the plaintiff has demonstrated with considerable clarity a great probability of success on the merits of its fourth cause of action, and particularly that a firm and unalterable determination [20] had been made by the Department of

---

19. In some respects, he appears to have been unfairly critical, e. g., he frequently used the word "misbranded" as follows:

Q. And then you have generic drugs with misbranded and mislabelled with trade names.

Now that means that essentially they have the same properties but they come from a different source; is that correct?

A. Yes.

Q. So "misbranding" there doesn't mean you get the wrong drug but it means you get it from a different source. You used here from time to time "it is misbranded" because it doesn't have a lot number; right?

A. Yes.

20. On this record, Park East has placed also in serious question the State's open-mindedness at the hearings being held before State Hearing Officer Zaidens.

Health, perhaps as early as 1975, to close this hospital, thus denying Park East due process of law, particularly as now required by the *National Health Planning and Development Act.* Irreparable injury having been earlier found, the preliminary injunction sought by the plaintiff is granted.

On the entire record, I find it appropriate to note that I cannot and do not conclude that the management of Park East always acted with alacrity to correct problems that many hospitals, particularly older ones, have. That attitude, to the extent it existed before, appears to have changed.[21] However, even assuming this former attitude, that is not justification for the roadblocks which plaintiff's proof strongly suggests the State at some point determined to put in its way of achieving compliance. Thus, it is to the State's conduct, and not the hospital's, that this opinion is addressed. Nothing in this opinion, however, is intended to be a statement that the State may not, in the exercise of its police power, protect the health needs of its citizens by requiring appropriate compliance with law. What is enjoined by this Court is any improperly motivated use of power by the withholding of approval of various changes to prevent remedy and thus reach a predetermined goal, to wit, the closure of a facility on the theory that it is excess.

The foregoing constitute my findings of fact and conclusions of law. Submit order on notice.

---

21. This is evidenced by the investment in new construction that is currently and expeditiously under way to meet the stringent requirements of the stipulation between Park East and HEW.